Commonwealth of Pennsylvania *v.* Perri, Appellant.

Argued April 10, 1929.

Before Trexler, Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*B. D. Oliensis,* for appellant.

*John H. Maurer,* Assistant District Attorney, and with him *John Monaghan,* District Attorney, and *Thaddeus M. Daly, Jr.,* Assistant District Attorney, for appellee.

Opinion by Cunningham, J., July 2, 1929:

These three appeals, which will be disposed of in one opinion, were taken by Joseph M. Perri, a former magistrate of the City of Philadelphia, from sentences to concurrent terms of imprisonment pronounced against him upon his conviction under three indictments, charging, respectively, conspiracy to release prisoners upon insufficient and fraudulent bail bonds, extortion and bribery, and misdemeanor in office. The

bill charging conspiracy named as a co-defendant one Samuel Wonsosky, a former constable, who entered a plea of guilty and testified in behalf of the Commonwealth. Magistrates have jurisdiction throughout the city, are ex-officio justices of the peace, and exercise the same jurisdiction and are liable to the same limitations and restrictions, pains and penalties, as aldermen. Under the Act of April 21, 1915, P. L. 145, any magistrate is authorized to release on bail any person committed for a hearing by any other magistrate.

Appellant's term of office was from 1922 to 1928 and the offenses charged against him were alleged to have been committed during the period from June to December, 1927. The evidence for the Commonwealth indicated in general that within these months Wonsosky, known in the community "as a man who could and would furnish bail" for persons charged with criminal offenses, and who described his occupation as that of "trying to help people out—getting them out on bail," brought to the office of appellant a number of persons as proposed sureties on some thirty-six bonds for the release of prisoners committed on criminal charges by other magistrates, and that appellant, for a corrupt consideration and without making any examination as to their solvency or sufficiency as sureties, and without requiring them to justify or qualify or even acknowledge their bonds, accepted the irresponsible persons brought in by Wonsosky as sureties, permitted them to sign the bonds and issued discharges for the prisoners. The amount which the defendants in these various criminal cases, or their friends, were required to pay was five per cent. of the amount of the bond, out of which percentage Wonsosky retained $5 or $10, as the case might be, and turned the remainder over to appellant. The aggregate of the bonds covered by the testimony was approximately

$27,300 and the amount alleged to have been corruptly received by Perri exceeded $1,000. At the oral argument it was frankly conceded by counsel for appellant that the evidence for the Commonwealth, as admitted by the learned trial judge, BROWN, J., was sufficient to sustain the convictions, but it is earnestly contended that some of the evidence was improperly received and that the charge was erroneous in several particulars.

The assignments are seven in number and, with the exception of those to the entry of the final judgments, are identical in each case. The first charges error "in allowing the withdrawal from the evidence of the little book, which the witness Wonsosky was permitted to· read while testifying, and at the same time permitting his testimony, which was predicated thereon, to remain in the evidence;" the second, third, fourth and fifth are based upon alleged erroneous instructions to the jury in those portions of the charge dealing with the questions of reasonable doubt, elements of conspiracy, corroboration of the testimony of an accomplice and the effect to be given to evidence of good character; the sixth to the refusal of a new trial; and the seventh to the entering of the final judgment in each case.

1. In considering the first assignment we note that the construction placed by counsel for appellant upon the events at the trial and the rulings of the trial judge differs materially from that contended for by counsel for the Commonwealth; it therefore becomes necessary to examine the record for the purpose of ascertaining exactly what transpired at the trial. The "little book" referred to in the assignment was a small memorandum book belonging to and carried by Wonsosky and had been in the custody of the Commonwealth since the date of his arrest. He testified that among other things written by him in this book were the

names and addresses of the sureties and of the defendants for whom he had arranged bail and the amount of each bond, but not the amounts of money received by him or the shares paid over to appellant. The material writings which figured in the trial were the bonds themselves and this book. When Wonsosky was on the stand the assistant district attorney produced the book as an exhibit for the Commonwealth. After the witness had identified it and testified that the entries therein were made by him at the time the transactions occurred, and after counsel for appellant had been permitted to cross-examine him relative to several apparent discrepancies in dates, the trial judge examined the book and ruled that the witness might be "permitted to use it to refresh his recollection as to what took place on those days," and that he might inspect the bonds for the same purpose. At the conclusion of the cross-examination of Wonsosky, the Commonwealth formally offered, and the court, over the objection of counsel for appellant, admitted, the book in evidence. The ground of the objection was that the witness "without the aid of that book to read from" was unable to testify to any material facts. In explanation of his ruling the trial judge said: "Of course, what the witness recalled is for the jury. They observed him. It seems to me he answered a good many questions without the aid of the book and without the bonds, considering that these things took place two years ago." Later, counsel for the Commonwealth stated that, in view of appellant's objection to the admission of the book and because it contained entries relating to cases other than those covered by the evidence, he withdrew the offer; the court thereupon directed that it be excluded from the other exhibits consisting of bonds, etc. Counsel for appellant then moved that a juror be withdrawn for the reason "that

this book, which my friend has seen fit to withdraw and which is not evidence, was gotten into the jury box by reading some thirty-one entries from it. ........ Anything that was read from the book I move either be stricken from the jury and from the record or else that a juror be withdrawn." The ruling on this motion reads: "The witness used the book for the purpose of refreshing his recollection. He did not read off of it but referred to the book in order to answer the questions. The motion is declined." It is apparent that there was a distinct issue between counsel for appellant and the trial judge as to the function of the book in the testimony of the witness—counsel asserting that he read from it and the judge stating that he only used it to refresh his recollection.

There is no difficulty about the rule in matters of this kind. The recollection of the witness—not the memorandum used to refresh it—is the real evidence. The question is whether the witness was testifying from his own recollection of the transactions, refreshed by inspecting the bonds and book, or merely reading their contents to the jury. If the witness has a present recollection of a past event, although his memory may be refreshed by a memorandum made at the time, he testifies from such recollection. When a witness has no present recollection of a past event, even when aided by a memorandum made by him or under his immediate supervision, the memorandum itself may be admissible (Christian Moerlein Brewing Co. v. Rusch, 272 Pa. 181, 187), but, as we read this record, this is not a case of that kind. The rule is stated in Lycoming County Mutual Insurance Co. v. Schreffler, 44 Pa. 269, 273, in this language: "We see no such error as would require a reversal in the use made of the particular statement [contents of a store] of the plaintiff. It seems to have been used to refresh

the memory of the witness, and such items as he could recollect as being in the store and in the statement he was permitted to identify and read from the statement. I cannot say this was wrong, but care should be taken that the recollection alone of the witness thus refreshed should constitute the testimony, and not the paper.'' The character of the testimony of the witness and the use actually made of the book, as well as the general trend of the testimony, may be shown by quoting what he said relative to procuring a bondsman for a woman charged with the illegal possession of liquor and whose bail had been fixed by another magistrate at $1,000: ''Q. I show you what purports to be a bond in the case of Cornelia Wopples, illegal possession of liquor, $1,000, October 25, 1927, signed at the bottom William Jones, 4631 Olive Street. Do you know William Jones? A. Yes, sir. ...... Q. Do you know what has become of him? A. No, I don't know. Q. Cornelia Wopples; did you know her? A. Yes, I knew her. Q. Do you know what has become of her? A. I don't know. They live around that neighborhood somewheres. Q. I call your attention to page 33 of your book and ask you whether there is any reference in that book with respect to that case? A. Yes, sir. Q. Have you read it and refreshed your recollection? A. Yes, sir. Q. Who got you to get William Jones to sign this paper? A. I don't remember who got me in the case. Q. How much did you collect in the matter? A. $50. Q. From whom? A. I don't remember who paid me. Q. What did you do then after you got it? A. Went down to Magistrate Perri's. Q. With whom? A. With Jones. Q. What happened down there? A. Signed the bond and got a discharge. Q. Who signed it? A. William Jones. ...... Q. What did you do with the money? A. The judge got $40 of it. Q. What became of the rest of

it? A. I kept it. Q. Did you know Jones? A. I have known him, yes, sir. Q. What business was he in? A. I don't know what he was doing. Q. Where did he live? A. 4631 Olive. Q. Did he own anything? A. Had his home there. Q. He did not own it? A. No, I don't think he did, no. Q. Was any questions asked of him? A. No questions asked. ...... Q. What was said to him that led him down there to sign his name there, if anything? A. He lived in the same house with the woman. Q. Who asked him to sign his name there? A. He was called in the back there after I spoke to the judge and signed his name. Q. You were in there first, were you? A. Yes, sir. Q. What did you do in there first? A. Told the judge what I got and paid him off. Q. Paid the judge off? A. Paid the judge off. Q. How much did you collect in the case? A. $50. Q. How much did you give the magistrate? A. $40. Q. $40? A. That is with the costs.'' We think this testimony demonstrates that the witness had a definite and independent recollection of the events concerning which he testified, which recollection was merely refreshed as to names, addresses and amounts by looking at the bonds and his own memorandum.

The ruling assigned for error was in accordance with the principles to which we have referred; see also Com. v. Klein, 42 Pa. Superior Ct. 66, 85. We may add that the witness, while under cross-examination and when the book was in the hands of the examining counsel, related the essential details of at least a dozen similar bond transactions with the exception of the amounts of the bonds which he said he could not recall without referring to them or to his memorandum. The first assignment is accordingly overruled.

2. The assignments next requiring attention are those challenging the correctness of portions of the

charge. No exceptions were taken at its conclusion, nor did the attorney who tried the case for appellant avail himself of the opportunity afforded to suggest corrections or additions. Several weeks later, additional counsel having been retained, the trial judge allowed, nunc pro tunc, the exceptions upon which these assignments are based. The criticism of the portion of the charge defining a "reasonable doubt" (second assignment) is that, although each of the phrases used to describe what it is and what it is not has received the sanction of our appellate courts, they were here placed in such juxtaposition, and the limitations so unnecessarily and emphatically repeated, as to render the instruction confusing and misleading. The court said: "The defendant Perri comes before you presumed to be innocent until his guilt is established by the evidence in the case beyond a reasonable doubt. A reasonable doubt is what the words themselves signify, that is, a doubt which is reasonable. It is not one to be conjured up in your minds but must arise from the evidence in the case. The reluctance to reach a conclusion which one is to heed is not one caused by sympathy or compassion for the defendant or others who may be affected by a verdict of guilty against him. It must not be a doubt which comes out of your heart but one which arises in your mind after a consideration of the evidence. It is not one to be conjured up by you but one which actually exists in your minds from the evidence which you have heard. It is not one that arises in your minds because of a desire to escape what you might consider an unpleasant or disagreeable duty. It is one that in a matter of importance to yourself, in your own life, in your own business, would cause you to pause and hesitate. It must be a real doubt, not a fictitious one, but a substantial doubt. If you have such a doubt

this defendant should have the benefit of it and your verdict should be rendered accordingly. A doubt to work the acquittal of a defendant must be serious and substantial, not the mere possibility of a doubt. If the evidence convinces you of the guilt of the defendant beyond a reasonable doubt you are bound to convict." This subject has been so recently and fully considered by the Supreme Court in Com. v. Green, 292 Pa. 579, and by this court in Com. v. Fisher, 96 Pa. Superior Ct. 155, that repetition is unnecessary. Counsel for appellant complain particularly that the court, as they express it, "capped the climax as it were" with the instruction that a doubt to work the acquittal of the defendant must be "serious and substantial." There is abundant authority for the use of this phrase: Com. v. Taylor, 78 Pa. Superior Ct. 386, 388. We are not persuaded that appellant has any just cause to complain of this portion of the charge.

By the third assignment it is charged that some of the elaborations of the definition of conspiracy were erroneous. The contention in behalf of appellant is that the effect of the instruction was "the elimination of active co-operation as an essential element of conspiracy and the erroneous substitution therefor of mere passive assent." After giving the jury the general definition of conspiracy the trial judge enlarged upon it by saying that "it embraces where two or more persons combine and agree together to do an unlawful act, or to do a lawful act by the use of unlawful means," and added that a "common intention to jointly do any one act" was unnecessary; and that it was enough if "in doing the several acts" they had a common object in view. It is conceded by the learned counsel who made the argument for appellant that down to this point the instructions were correct,

but it is asserted that their effect was not merely neutralized but actually destroyed by the sentences immediately following. They read: "It is not necessary that each should intend to do any act, which, preceded or followed by the act of the other, will produce the ends which both propose. Conspiracy is thus the assent, communicated to each other, of each of two or more persons to the future effectuation of a certain result by the acts of one or more of them, which effectuation is in their intention to be the consequence of this assent."

It is argued that in the first sentence, above quoted, the jury was told that actual co-operation or participation in doing any one of the several acts comprising the conspiracy was unnecessary, and in the second that it is enough if one merely passively assents to an act done by another or to the result which will follow from such an act. The criticism is not unwarranted. If the trial judge intended the jury to understand that mere passive assent "to the future effectuation of a certain result" is sufficient to make one a co-conspirator such instruction would be erroneous. The obscurity of the instruction, and its apparent inconsistency with what had just been said, evidently arose from the fact that the court used two disconnected paragraphs from a text book, Trickett on Criminal Law in Pennsylvania, Vol. 1, pp. 387 and 388, neither of which had any application to the evidence in this case, without also giving the author's illustration of the applicability of the principle laid down. Each of the sentences under discussion was correctly quoted from the text book, but the court unfortunately omitted a paragraph placed by the author between them which makes their meaning clear. That paragraph reads: "A. might suggest, advise, persuade that B. do all the acts, and produce the effect, and if B. assents, they con-

spire.'' Under the evidence, this is not a case of one person suggesting, advising or persuading another to commit the unlawful acts charged, but one in which each of the defendants named in the bill actively participated in their commission. Granting that the instruction, considered as a proposition of law, was incomplete and therefore misleading it does not follow that it amounted to reversible error. In the late case of Com. v. Quaranta, 295 Pa. 264, 275, the trial judge instructed the jury in one part of the charge to the effect that the prisoner must establish the facts constituting his defense ''beyond a reasonable doubt.'' In other parts the jury was told that even where an affirmative defense is set up the only burden on the defendant is to establish his position ''by a fair preponderance of the evidence.'' Discussing this situation, our Supreme Court said: ''When the testimony shows the verdict in the case to be a just one, the errors in the charge of the court that will justify a reversal must be such that the inevitable effect would be to prejudice the jury or leave them without a requisite legal guide in a matter fundamental to the case. . . . . . . Under such circumstances, where a mistake in the charge was amply corrected by subsequent instructions, the verdict being a just one, we will not reverse because of a single badly phrased instruction. As recently stated by us in Com. v. Daily (No. 2), 280 Pa. 59, 64-5, 'where the evidence against defendant . . . . . . leaves no doubt . . . . . . as to the justice of his conviction, a [judicial] slip of the tongue . . . . . . should not cause a reversal unless the reviewing court feels, not simply that the mistake in question possibly influenced the jury against defendant, but that it is strongly probable the verdict rendered reflects such adverse influence.' ''

The portions of the charge applicable to the issues

in this case define and describe the offense of conspiracy so clearly and correctly that we are satisfied the jury was not misled with respect to the real questions for their determination under that indictment.

The criticism (fourth assignment) of the manner in which the trial judge observed "the time-honored rule" (Com. v. Williams, 275 Pa. 58, 65,) that the court should caution jurors against convicting upon the uncorroborated testimony of an accomplice is leveled at only a part of what was said upon that subject in this case. It is not questioned that the admonition to instruct that such testimony should be considered with extreme caution and scrutinized with great care (Com. v. Howe, 84 Pa. Superior Ct. 295, 296,) was heeded. The jurors were told that the "uncorroborated testimony of an accomplice will sustain a verdict of guilty" but that they should "carefully scrutinize such testimony before giving it weight" and accept it only if impressed "with the truth of the statement beyond a reasonable doubt." The court, in accordance with Com. v. Haines, 257 Pa. 289, 297, directed the attention of the jury in a general way to the testimony which tended to corroborate the accomplice as well as to that which contradicted him. The particular complaint is against this instruction: "Corroboration need not extend to the whole of his testimony. If he spoke with truth as to some material matter you may infer he has done it in others."

It is correctly stated by appellant's counsel that the cautious scrutiny should extend to the entire testimony of an accomplice and it is argued that the trial judge was not justified in instructing the jury that if they found the accomplice "spoke with truth as to some material matter" they might "infer he has done it in others." If this had been all the court said in this connection there would be force in the criticism

but the language complained of was immediately followed by the further instruction: ''You must be satisfied he was truthful in material parts of his testimony. It is better to have the testimony of an accomplice corroborated in material parts, some material parts that indicate his truthfulness, but that is not absolutely necessary if you are satisfied that the witness was telling the truth.'' We think this last instruction brought this case within Com. v. Elliott, 292 Pa. 16, 23, in which, after a discussion of the cases on the subject, it was held that where both the jury and the trial judge are satisfied the accomplice was truthful ''in the material parts'' of his testimony there is no good reason why the verdict should not stand.

As we understand the argument for appellant upon the fifth assignment, it is to the effect that his conviction should be reversed because, although the trial judge, in that portion of the charge relating to the manner in which the evidence of appellant's good character should be considered and weighed, told the jury that such evidence ''is substantive and positive proof in the defendant's behalf and may give rise to a reasonable doubt which would not otherwise exist, by making it improbable that a man of such character would commit the offense charged,'' he did not distinctly say that such evidence may ''of itself'' (Com. v. Kester, 58 Pa. Superior Ct. 509, 514,) create such doubt. An extended discussion of this assignment is unnecessary. The legal sense in which the word ''character'' is used was explained to the jury in the language of Com. v. Webb, 252 Pa. 187, 196, and, in the language of that case and of Com. v. Chester, 77 Pa. Superior Ct. 388, 395, the jury was told the purpose for which such evidence is received, the reason for its admission and the effect to be given it. They were instructed that ''such evidence does not raise a distinct

issue and it is not brought into the case as a mere makeweight.'' This charge is not open to the objection stated in Com. v. Kester, supra, to the effect that under the charge there the jury would be led to suppose ''that the time when this kind of evidence would become important was when they reached the point where they were in doubt.'' The objection now urged would have been avoided if the court had explicitly told the jury that such evidence ''may of itself'' create a reasonable doubt of the defendant's guilt, but we are satisfied from a careful examination of all the trial judge said on this subject that this jury was instructed substantially to that effect. We find no reversible error in the charge and the assignments thereto are dismissed.

The reasons urged in support of the motion for a new trial were identical with the subject matter of the assignments; it was properly refused. Notwithstanding appellant's positive denials, there was abundant and convincing evidence of his guilt of a peculiarly odious crime—the prostitution of an important judicial office, intimately connected with the enforcement of our criminal laws, to the private gain of the incumbent.

Under such circumstances an appellate court, in the language of KELLER, J., in Com. v. Fisher, supra, ''should not be astute in reviewing a just conviction.''

The judgments are severally affirmed.